FILED ____ LODGED
____ RECEIVED ____ COPY

AUG 1 6 2023

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

SEALED

1  Leonard Aragon, AZ #020977
   HAGENS BERMAN SOBOL SHAPIRO LLP
2  11 West Jefferson Street, Suite 1000
   Phoenix, Arizona 85003
3  Telephone: (602) 840-5900
4  Fax: (602)840-3012
   leonard@hbsslaw.com
5

6  Susan M. Coler,*MN #0217621
   HALUNEN LAW
7  80 South 8th Street, Suite 1650
8  Minneapolis, Minnesota 55402
   Telephone: (612) 605-4098
9  Fax: (612) 605-4099
10 coler@halunenlaw.com
   (*pro hac vice forthcoming)
11

12 Attorney for Plaintiff/Relator Thomas N. Crumbley, M.D.

13           UNITED STATES DISTRICT COURT
14                DISTRICT OF ARIZONA

15 United States of America *ex rel.* Thomas N.     Case No.:  **CV23-01672-PHX-ROS**
16 Crumbley, M.D.,

17              Plaintiff/Relator,              **COMPLAINT FOR
                                                 VIOLATIONS OF THE FALSE
18                    v.                          CLAIMS ACT, 31 U.S.C. §§ 3729,
                                                 *et seq.*
19
20 St. Luke's Behavioral Hospital, LP, d/b/a St.  **JURY TRIAL DEMANDED**
   Luke's Behavioral Health, Steward Health
21 Care System LLC,                              **FILED UNDER SEAL
                                                 PURSUANT TO 31 U.S.C.
22              Defendants.                       § 3730(b)(2)**
23

24        Medicare covers partial hospitalization programs (PHPs) for persons who would
25 otherwise require inpatient psychiatric care. Plaintiff/Relator Thomas N. Crumbley, M.D.
26 founded "Momentum," a PHP offered by defendant St. Luke's Behavioral Health (St.
27 Luke's), the fictitious name or d/b/a of St. Luke's Behavioral Hospital, L.P., owned by
28 defendant Steward Health Care System (together, "St. Luke's). For more than a decade,

1  Momentum operated successfully, effectively and in compliance with strict statutory and
2  regulatory requirements that ensured that PHP coverage was available only for persons for
3  whom the program was medically necessary.

4      But then St. Luke's began to cut corners in the program to save money and no doubt
5  increase profits. When Relator refused St. Luke's ultimatum to admit all who wanted to
6  participate in Momentum regardless of whether they were eligible for PHP coverage, St.
7  Luke's terminated him as medical director and as a psychiatrist who could offer services
8  to PHP participants. Once Relator was out of the way, St. Luke's continued to abuse the
9  program more expansively. It fraudulently admitted persons who did not meet the
10  requirements for a PHP and failed to ensure those who needed the program received the
11  services that Medicare paid for, all the while collecting the per diem rate Medicare intended
12  to pay only for eligible persons who received the services mandated by PHP statutes and
13  regulations.

14      Relator Thomas N. Crumbley, M.D., brings this action on behalf of himself and the
15  United States, under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*. (FCA), against St.
16  Luke's for its fraudulent conduct and seeks treble damages, statutory penalties, and other
17  relief arising from St. Luke's fraudulent conduct. He also seeks individual relief for St.
18  Luke's retaliation against him for reporting fraudulent conduct and his efforts to prevent
19  violations of the FCA. The causes of action asserted in this complaint are based on the facts
20  and information set forth below:

21  **I.    NATURE OF THE ACTION**

22      1.    Relator is a board-certified psychiatrist who implemented St. Luke's PHP
23  called "Momentum" in 2004 and served as its medical director until he was abruptly fired
24  in August of 2020 after voicing concerns that the PHP did not comply with Medicare
25  requirements and after making efforts to stop the fraud.

26      2.    A PHPs purpose is to provide intensive outpatient treatment for persons with
27  serious mental illness, in lieu of hospitalization. Medicare pays the PHP a per diem rate per
28  person for the outpatient treatment.

3.    To ensure that PHPs solely served their intended purpose, the enacting statutes and their accompanying regulations mandated, among other things, that patients meet strict criteria for eligibility and that PHPs certify all patients' initial and ongoing eligibility for the program. They further require formulation, implementation and monitoring of a treatment plan for the patient, including 20 hours per week of services, as well as physician oversight.

4.    Momentum operated a successful, effective PHP that was compliant with the strict requirements for more than a decade.

5.    St. Luke's then began to institute changes in the program that eroded its compliance with statutory and regulatory requirements. Over Relator's objections, it eliminated the required certifications of patient eligibility and instituted changes that made it less likely that patients would receive 20 hours of treatment. When St. Luke's demanded that Relator admit all potential patients to the PHP regardless of their actual eligibility, he refused and was immediately terminated.

6.    Over the subsequent years, St. Luke's admitted patients who were not actually eligible for the program, continued to fail to certify their eligibility, and became much more lax in ensuring that patients received 20 hours of services per week under a physician's supervision.

7.    Accordingly, St. Luke's statements about and claims for the per diem payment for inappropriately placed patients and for patients for whom it failed to provide proper treatment services were false and resulted in fraudulent claims for payment in violation of the FCA.

8.    St. Luke's fraudulent conduct was not only a misuse of legislatively mandated public funds appropriated to provide critical assistance to severely mentally ill persons, but also an abuse of patients placed in a program not appropriate for their needs, and even more tragic, an abuse of those patients appropriately placed in a PHP who did not receive the mandated services paid for by Medicare.

1  **II.    PARTIES**

2       **A.    Plaintiff/Relator**

3       9.    Relator Thomas N. Crumbley, M.D., a resident of Arizona, is a psychiatrist

4  who founded and served as the Medical Director of St. Luke's Behavioral Health's

5  psychiatric partial outpatient program called Momentum: Mental Illness Program

6  ("Momentum") in Phoenix, Arizona, for more than 16 years. Relator's organizational NPI[1]

7  for Thomas N. Crumbley, M.D., P.C. is 1952424178; he also has an individual NPI,

8  1831367457.

9       10.    Relator brings this matter on behalf of the United States under the FCA. The

10  United States acts through its various agencies and departments, including the Department

11  of Health and Human Services (HHS) and the Centers for Medicare and Medicaid Services

12  (CMS).

13       **B.    Defendants**

14       11.    St. Luke's Behavioral Hospital, LP, is a Delaware limited partnership, d/b/a

15  St. Luke's Behavioral Health Center, located at 1800 East Van Buren Street, Phoenix AZ

16  85006. St. Luke's previously was operated by IASIS Healthcare, LLC, which merged with

17  the Steward Health Care System LLC in 2017. St. Luke's is designated a Steward Family

18  Hospital.

19       12.    Steward Health Care System LLC, is a Delaware Limited Liability Company

20  operating, in part, as an accountable care organization (ACO) with its principal office at

21  1900 North Pearl Street, Suite 2400, Dallas, TX 75201. Steward currently operates over 30

22  hospitals in multiple states, including St. Luke's Behavioral Health Center in Phoenix,

23  Arizona.

24  **III.    JURISDICTION AND VENUE**

25       13.    This Court has subject matter jurisdiction over the FCA claims alleged in this

26

27  _____

[1] A National Provider Identifier (NPI) is a unique CMS billing identification number for

28  health care providers.

1  complaint under 28 U.S.C. §§ 1331 and 1345 because this action involves a federal
2  question and because the United States is a plaintiff.  This Court also has subject matter
3  jurisdiction under 31 U.S.C. § 3732(a).

4          14.    The Court may exercise personal jurisdiction over Defendants under 31
5  U.S.C. § 3732(a) because they can be found, reside, or transact business in this district and
6  because the claims arise out of or relate to Defendants' contacts with Arizona.

7          15.    Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C.
8  § 1391(b) because Defendants can be found, reside, and transact business in this district;
9  an act proscribed by 31 U.S.C. § 3729 occurred within this district; and a substantial part
10  of the events or omissions giving rise to the claims alleged in this complaint occurred in
11  this district.

12          16.    Relator is aware of no subject matter or other jurisdictional bars set forth in
13  the FCA that would apply to this action.

14          17.    Relator is aware of no statutorily relevant public disclosure of the allegations
15  or transactions forming the core elements of the Counts against Defendants.  Even if such
16  a disclosure had occurred, Relator is the "original source" of the allegations in this
17  complaint as that term is used in the FCA.  Relator acquired material, firsthand, and non-
18  public knowledge of the information on which the allegations in this complaint are based,
19  and Relator voluntarily and in good faith disclosed this information to the United States
20  Attorney's Office for the District of Arizona before filing this complaint.

21  **IV.    THE FALSE CLAIMS ACT**

22          18.    The FCA makes it unlawful for any person to submit, directly or indirectly,
23  false or fraudulent claims for payment to the Government.  *See* 31 U.S.C. §§ 3729, *et seq.*

24          19.    Relator alleges liability primarily under two of the FCA's seven liability
25  provisions.

26          20.    First, the FCA's "presentment" provision, 31 U.S.C. § 3729(a)(1)(A),
27  imposes liability against a defendant who "knowingly presents, or causes to be presented,
28  a false or fraudulent claim for payment or approval."

21.    Thus, liability under 31 U.S.C. § 3729(a)(1)(A) attaches when a defendant (a) made, or caused to be made, a claim (b) that was false or fraudulent (c) knowing of its falsity.

22.    Second, the FCA's "false records or statements" provision, 31 U.S.C. § 3729(a)(1)(B), imposes liability against a defendant who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

23.    Thus, liability under 31 U.S.C. § 3729(a)(1)(B) attaches when a defendant (a) made, used, or caused to be made or used, a record or statement that was (b) knowingly false and (c) material to a false or fraudulent claim.

24.    The "knowledge" element of the FCA is defined as (1) "actual knowledge of the [falsity of the] information"; (2) "deliberate ignorance of the truth or falsity of the information"; or (3) "reckless disregard of the truth or falsity of the information" provided to the Government. 31 U.S.C. § 3729(b)(1)(A).

25.    To plead and prove knowledge, no specific intent to defraud need be shown. 31 U.S.C. § 3729(b)(1)(B).

26.    Under the FCA, the term "claim" means any request or demand for money, whether under a contract or otherwise, presented to an officer, employee, or agent of the United States. 31 U.S.C. § 3729(b)(2)(A)(i).

27.    A "claim" is also a request or demand for money made to a contractor or other recipient if (a) the money is to be spent or used on the Government's behalf or to advance a Government program or interest and (b) if the Government provides, has provided, or will reimburse such contractor or other recipient for any portion of the money requested or demanded. 31 U.S.C. § 3729(b)(2)(A)(ii).

28.    The FCA defines "material" objectively, not subjectively, to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

29.    This "natural tendency" test has long been the standard in the Ninth Circuit.

1   *See, e.g., United States v. Bourseau*, 531 F.3d 1159, 1171 (9th Cir. 2008).

2       30.    The Supreme Court reaffirmed the natural tendency test and described a

3   holistic approach to analyzing it. *See Universal Health Services, Inc. v. United States ex*

4   *rel. Escobar*, 136 S. Ct. 1989, 1996 (2016).

5       31.    In determining whether a false claim or statement is "capable of influencing"

6   the Government's decision-making process, the FCA's materiality standard looks to the

7   effect on the likely or actual behavior of a recipient of the misrepresentation and "depends

8   on the particular facts of each case." *United States ex rel. Rose v. Stephens Inst.*, 909 F.3d

9   1012, 1019, 1021 (9th Cir. 2018).

10      32.    The FCA empowers private persons having information regarding a false or

11  fraudulent claim against the Government to sue on behalf of the Government and to share

12  in any recovery. 31 U.S.C. § 3730(b).

13  **V.    THE LEGAL UNDERPINNINGS FOR PSYCHIATRIC PARTIAL**

14  **HOSPITALIZATION PROGRAMS UNDER MEDICARE PART B**

15      33.    Medicare is a federal program that provides federally subsidized health

16  insurance for persons who are 65 years or older or are disabled. *See* 42 U.S.C. §§ 1395 *et*

17  *seq.* As relevant here, Part B of Medicare provides supplemental coverage for physician

18  and outpatient department services. *See* 42 U.S.C. §§ 1395j to 1395w-4.

19      34.    Both hospitals and community mental health centers are eligible to receive

20  Medicare Part B payments for certain qualifying outpatient mental health services

21  including psychiatric partial hospitalization programs (PHPs). 42 U.S.C. § 1395x(ff). This

22  program is "furnished by a hospital to its outpatients" and constitutes "a distinct and

23  organized intensive ambulatory treatment service offering less than 24-hour-daily care

24  other than in an individual's home or in an inpatient or residential setting." 42 U.S.C. §

25  1395x(ff)(3)(A).

26      35.    The majority of individuals likely to participate in a PHP are persons who

27  are covered by Medicare because they are recipients of Social Security Disability Insurance

28  (SSDI), typically due to serious mental illness, that prevents them from working.

1   Individuals entitled to Medicare by age are also covered if they are eligible for a PHP. In

2   more recent years, the Arizona Health Care Cost Containment System (AHCCCS) also

3   provides coverage for psychiatric facility-partial hospitalization. AHCCCS services are

4   covered significantly (70-76 % for period from 2019-2023) by federal funds through

5   Medicaid Federal Medical Assistance Percentage payments. 42 U.S.C. § 1396d(b).

6       36.    The statutes and regulations enacted for PHP programs are detailed in

7   describing the program mandates.

8       37.    To be covered by Medicare, PHP services can only be prescribed if an

9   individual "would require inpatient psychiatric care in the absence of such services." 42

10  U.S.C. § 1395n(a)(2)(F)(i).

11      38.    PHP programs must be prescribed by a physician and include a written plan

12  of treatment, also under the supervision of a physician. 42 U.S.C. § 1395x(ff)(1). To

13  participate in a PHP program, the prescribing physician must indicate that the individual

14  has "a need for such services for a minimum of 20 hours per week," and the PHP must

15  provide those services "under the supervision of a physician pursuant to an individualized,

16  written plan of treatment established and periodically reviewed by a physician (in

17  consultation with appropriate staff participating in such program), which plan sets forth

18  the physician's diagnosis, the type, amount, frequency, and duration of the items and

19  services provided under the plan, and the goals for treatment under the plan." *Id.*

20      39.    The regulations for PHPs reiterate the statutory requirements and further

21  require a "certification" by a physician that the individual meets the requirements of the

22  program, in addition to a written individualized plan of treatment. 42 C.F.R. §§ 424.24(b),

23  (e)(1), (2)(i). The regulations also add a provision that the physician "determines the

24  frequency and duration of the services" based on accepted medial practice norms and

25  reasonable expectations for the patient's improvement. 42 C.F.R. § 424.24(e)(2)(ii).

26      40.    Applicable regulations further articulate the intent of a PHP to admit patients

27  who require a "minimum" of 20 hours of therapeutic services, are likely to benefit from

28  this type of program, do not require 24-hour care, have a support system outside the

1  program that is adequate, are not judged to be dangerous to self or others, and have the
2  cognitive and emotional ability to actively participate in and tolerate the intensity of the
3  PHP. 42 C.F.R. 410.43(c). *See also*, Medicare Benefit Policy Manual (Rev. 10541, 12-31-
4  20) (MBPM), Ch. 6, § 70.3.B.1 ("Patients admitted to a PHP must be under the care of a
5  physician who certifies the need for partial hospitalization and require a minimum of 20
6  hours per week of therapeutic services, as evidenced by their plan of care.").

7      41.    The MBPM provides further insight into the PHP, describing it as "treatment
8  at a level more intense than outpatient day treatment or psychosocial rehabilitation" and
9  further elaborating:

10          Partial hospitalization is active treatment that incorporates an individualized
11          treatment plan which describes a coordination of services wrapped around
12          the particular needs of the patient, and includes a multidisciplinary team
13          approach to patient care under the direction of a physician. The program
14          reflects a high degree of structure and scheduling. According to current
15          practice guidelines, the treatment goals should be measurable, functional,
16          time-framed, medically necessary, and directly related to the reason for
17          admission.

18  MBPM, Ch. 6, § 70.3(A).

19      42.    The types of services covered by Medicare Part B for PHPs include
20  individual and group therapy, occupational therapy, social work services, drugs and
21  biologics, individualized activity therapies that are not primarily recreational or
22  diversionary, family counseling focused on the treatment of the individual's condition,
23  patient training and education related to the individual's care and treatment, and diagnostic
24  services, performed by appropriate professionals. 42 U.S.C. § 1395x(ff)(2); 42 C.F.R. §
25  410.43(a)(4).

26      43.    The regulations provide specific parameters for a periodic review of the plan
27  of treatment, as required by 42 U.S.C. § 1395x(ff)(1). This review is labeled
28  "recertification" in the regulations: "The physician recertification must be signed by a

- 9 -

physician who is treating the patient and has knowledge of the patient's response to treatment." 42 C.F.R. § 424.24(e)(3)(i). A physician must recertify the patient's progress no later than 18 days after the patient's admission to the PHP and no later than every 30 days after that until discharge.   42 C.F.R. § 424.24(e)(3)(ii). The contents of a recertification are also specified: it must state that inpatient psychiatric care would be required absent participation in the PHP and must describe the patient's response to the therapeutic interventions provided by the PHP, the psychiatric symptoms that place the patient at risk of hospitalization and treatment goals to facilitate discharge. 42 C.F.R. § 424.24(3)(e)(3)(iii)

44.     Adequate and accurate documentation of all of the above activities is critical for payment, as the Social Security Act requires services to be documented in order for payments to be made. 42 U.S.C. § 1395l(e); *see also, e.g., U.S. v. Crabtree,* 878 F.3d 1274, 1279 (11th Cir. 2018) (noting strict and thorough documentation and charting requirements for a PHP are necessary to provide "a medical record justifying the patient's continued treatment and ensures that each patient is discharged—or readmitted—consistent with her medical needs").

45.     Medicare only pays for Part B services that are actually rendered and are reasonable and medically necessary.[2] 42 U.S.C. § 1395y(a)(a) (A) ("*no payment may be made* under part A or part B for any expenses incurred for items or services… [that] are not reasonable and necessary for the diagnosis or treatment of illness or injury…") (emphasis added).

46.     Additional requirements are specified for Medicare to pay for PHP services under Part B. Payment is allowed "*only if*…the individual would require inpatient

_____

[2] A reasonable and necessary" service "meets, but does not exceed, the patient's medical need" and is furnished "in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition ... in a setting appropriate to the patient's medical needs and condition[.]" CMS, Medicare Program Integrity Manual § 13.5.4 (2019).

psychiatric care in the absence of such services, (ii) an individualized, written plan for furnishing such services has been established by a physician and is reviewed periodically by a physician, and (iii) such services are or were furnished while the individual is or was under the care of a physician." 42 U.S.C. § 1395n(a), (a)(2)(F) (emphasis added); The regulations further mandate as a condition of payment a "certification" that "The individual would require inpatient psychiatric care if the partial hospitalization services were not provided." 42 C.F.R. § 424.24 (b), (e)(1); *see also,* 42 C.F.R. 410.43(a) (besides being "reasonable and necessary for the diagnosis or active treatment of the individual's condition," services provided must be "reasonably expected to improve or maintain the individual's condition and functional level and to prevent relapse or hospitalization"). Medicare Part B will pay for PHP services "only if" the proper certification is made. 42 C.F.R. 424.24(b).

47.     Medicare pays a per diem rate for each day a beneficiary participates in PHP. That rate was about $260 over the last several years that Relator was the Momentum medical director.

48.     Other therapeutic services provided to PHP patients on an individual basis are not included in the per diem rate. They are paid separately on a fee schedule basis and include, for example, services by physicians, physician assistants, nurse practitioners and clinical nurse specialists, as well as "qualified psychologist services" provided by or incident to service by a clinical psychologist. 42 C.F.R. § 410.43(b). For example, when Relator provided psychiatric evaluations and follow-up visits with a patient, he billed those services directly to Medicare under his organizational NPI.

49.     CMS pays hospitals for PHP services on a per diem basis under the hospital outpatient prospective payment system (OPPS).

50.     To be eligible to receive payments under Medicare, St. Luke's was required to file a provider agreement with the Secretary of HHS ("the Secretary") in which it agreed to comply with the requirements that the Secretary deems necessary for participation in the program. 42 U.S.C. § 1395cc.

51.    To complete the enrollment application,[3] St. Luke's certified its:

    a.  Familiarity with and agreement to abide by applicable Medicare or other federal health care program laws, regulations, and program instructions, which are available through the Medicare contractor;

    b.  Understanding that payment of a claim by Medicare or other federal health care programs is conditioned on the claim and the underlying transaction complying with such laws, regulations and program instructions, and that payment is conditioned on compliance with any applicable conditions of participation in any federal health care program; and

    c.  Agreement not to knowingly present or cause to be presented a false or fraudulent claim for payment by the Medicare or other federal health care programs and not to submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

52.    CMS contracts with private contractors referred to as Medicare Administrative Contractors (MACs) to act as agents in reviewing and paying claims submitted by health care providers. 42 U.S.C. §1395u(a).

53.    At all relevant times, Noridian Healthcare Solutions, LLC, was the MAC that administered Medicare Part B claims for St. Luke's in Arizona and to which St. Luke's submitted all Medicare Part B claims.

54.    Among other things, participating providers are prohibited from making false statements or representations of material facts concerning payment requests. 42 U.S.C. §§ 42 U.S.C. § 1320a-7a(1); 1320a-7b(a)(1), (2).

55.    Claims may be submitted to Noridian through a paper claim using CMS 1500 form (CMS 1500)[4] or through its electronic equivalent, the 837P form. An entity may use

---

[3] https://www.cms.gov/medicare/cms-forms/cms-forms/downloads/cms855a.pdf

[4] https://www.cms.gov/medicare/cms-forms/cms-forms/downloads/cms1500.pdf

1    paper claims only if it meets certain exemptions.

2        56.    Besides information about the Medicare beneficiary, the information

3    provided to Noridian through either form includes information, such as the proper codes

4    for the services rendered, the NPI of the "rendering provider" and the "referring provider

5    or other source."

6        57.    The forms require a signature certifying that the information provided is

7    "true, accurate, and complete," as well as the signer's familiarity with applicable laws,

8    regulations, and program instructions. The signature further certifies that the claim

9    complies with "all applicable laws, regulations, and program instructions for payment."

10        58.    If a provider submits claims electronically, it must sign an "Electronic Data

11    Interchange (EDI) enrollment form" also certifying that "it will submit claims that are

12    accurate, complete, and truthful" and that it understands that falsifying information

13    relating to a claim may result in subjection to a fine or imprisonment under applicable

14    Federal law."[5]

15        59.    At all times material to this action, St. Luke's received reimbursement from

16    Medicare and, therefore, is reasonably presumed to have signed a Medicare enrollment

17    application as described above, an EDI enrollment form, and individual Form 1500s or

18    837Ps for individual claims.

19        60.    To become an Arizona provider of any type for AHCCCS, a provider must

20    complete its Provider Enrollment Form.[6]

21        61.    The Provider Enrollment Form includes and requires submission of a

22    Provider Participation Agreement (PPA) signed by the provider, stating, "I have read,

23    understand, and agree to abide by all the terms and conditions set forth in this Agreement."

24    PPA at 22.

25

26    [5] https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS10164B.pdf.

27    [6]https://www.azahcccs.gov/PlansProviders/Downloads/ProviderRegistration/ProviderEnr
28    ollmentFillableForm.pdf

62.    The PPA specifically states that the provider "must comply with "all the federal, state, and local laws, rules, regulations, policies, standards, and executive orders governing or otherwise related to the performance of duties under this Agreement, *id.* at ¶ 7"; "all AHCCCS and/or Contractor Provider Manuals and Policy Guidelines, *id.* at ¶ 8"; and "all the applicable provisions contained in the False Claims Act and as amended by the Federal Fraud Enforcement and Recovery Act of 2009 (FERA)." *Id.* at ¶ 24.

63.    To provide services for AHCCCS and receive federal monies, St. Luke's is reasonably presumed to have signed a PPA.

64.    AHCCCS providers also use the CMS 1500/837P forms, which requires them to certify that the claim is accurate, complete, and truthful.

## VI.    FACTUAL BASIS FOR VIOLATIONS OF THE FALSE CLAIMS ACT

### A.    Relator Founded Momentum, a Psychiatric PHP, Which Operated Successfully for Many Years in Compliance with PHP Statutes and Regulations.

65.    Relator is a physician who graduated from the University of Tennessee College of Medicine, and completed his psychiatric residency at Yale. He is certified by the American Board of Psychiatry and Neurology and a Distinguished Fellow of the American Psychiatric Association. He also has an MBA degree.

66.    Relator was the founder of Momentum, "a partial outpatient program designed to help increase the functionality and stability of adults with serious mental illness."[7] "The partial hospitalization level of care provides services five days a week for clients requiring maximum support."[8]

67.    In the 1990s, Relator had directed a PHP program for another entity. This

---

[7] https://www.stlukesbehavioralhealth.org/services-directory/momentum-mental-illness-program

[8] St. Luke's also offers an intensive outpatient program (IOP) that "offers services three days each week and is for those needing less acute care." *Id.* While this complaint sometimes generally references PHP/IOP services, the focus is on St. Luke's PHP offering.

1  gave him the experience and opportunity to develop a program model and intellectual

2  property for PHP/IOP programs that generated successful results. After working in other

3  programs, Relator persuaded a behavioral health facility, St. Luke's, to allow him to

4  implement his program at that institution. St. Luke's is an acute care hospital that reserved

5  an area at its Phoenix site for Momentum to operate. After development work during 2003,

6  Momentum officially opened its doors at St. Luke's in early 2004.

7      68.    Relator was Momentum's medical director from its beginnings through

8  August 2020. In that role, he reported to Greg Jahn, St. Luke's chief executive officer

9  (CEO), from the beginning of Relator's tenure in 2003, through June 2020, when Jahn

10  retired.

11      69.    Relator's responsibilities as medical director included  coordinating and

12  making recommendations about Momentum's activities with the hospital's CEO and

13  administration, providing education and in-service instruction for hospital personnel in

14  the operation of Momentum, reviewing and make recommendations about Momentum

15  policies and procedures, reviewing records and reports of patient service to promote

16  Momentum's quality of patient care, programming Momentum staff meetings for

17  education and supervision, participating in treatment team supervision meetings, and

18  coordinating care with other psychiatric providers. Relator served in that role as an

19  independent contractor and received a monthly payment from St. Luke's for his

20  responsibilities as medical director.

21      70.    Relator also provided services to Momentum as a practicing psychiatrist, for

22  which he billed Medicare on a fee-for-service basis. These services included, providing

23  psychiatric evaluations and directing the care of each patient with regular follow-up visits.

24      71.    Relator did not manage Momentum's day-to-day operations. That was the

25  responsibility of Momentum's program administrator. In Momentum's early years, the

26  program was coordinated by a consultant with whom Relator had previously worked in

27  developing the PHP model implemented at St. Luke's.

28      72.    In about the 2006-2007 time frame, St. Luke's discontinued its arrangement

with the consultant and, at Relator's urging, hired a program administrator (Employee A[9]) who had also worked with Relator previously. Employee A had participated in the development of the model that was used for Momentum, and understood how and why the model worked.

73. Momentum had immediate success in achieving positive results for and responses from its clients, importantly including no suicides[10] in its first three years. Momentum also had an immediate positive impact on St. Luke's bottom line. The program not only paid for itself from the start, but also significantly increased St. Luke's net revenue and profitability.

74. In the winter of 2007 St. Luke's added a second program at its East Valley site. It too was successful.

75. Relator's prior experience in developing and managing a PHP was gratifying, because he had developed a program that was well-liked in the community, focused on excellence, honesty, provided the best possible care to every patient served, and did not have problems getting its claims paid by CMS.

76. When Relator started Momentum, he was aware of abuses by many PHP programs that resulted in CMS requiring pre-payment audits[11] and shutting down many programs entirely. Wanting to replicate his success and run a model PHP that would be effective in serving the patients, Relator structured the program at St. Luke's to follow the rules and make Momentum a bullet-proof PHP in the eyes of CMS.

---

[9] The identities of persons identified as "Employee [letter]" will be provided as requested or needed by the Court and Defendant.

[10] The population served is at high risk for suicide, so this was a particularly notable accomplishment. *See e.g.,* https://www.pewtrusts.org/en/research-and-analysis/articles/2022/05/02/mental-health-conditions-can-contribute-to-suicide-risk

[11] A pre-payment audit requires a provider to submit the medical records necessary to justify payment before CMS actually pays a claim, in contrast to the typical "pay and chase" approach, which is that CMS pays the claim, and then, if it appears that the payment was not justified, recaptures that payment after the fact.

77.     The program ran smoothly, effectively, and profitably for many years through the efforts of Relator and program administrator, Employee A, and their staff.

78.     Momentum: Phoenix typically serviced about 40 patients at a time. Momentum: East Valley typically serviced between 20 and 30 patients.

79.     As medical director, Relator admitted patients to the program. He only admitted individuals who were eligible for the program based on the CMS criteria identified above. He then certified their eligibility as required by 42 C.F.R. § 424.24(e)(1). He further participated in and signed off on the development of the plan of treatment and followed the patients during their participation in the PHP. If the patient was still a participant in the PHP at the 18-day mark, Relator either re-certified the patient to continue, or made other decisions (e.g., discharge, move into lesser IOP program).

80.     The program operated for the patients from 9 a.m. through 2 p.m. The patients were scheduled to receive at least 20 hours of treatment each week. The schedule provided four group sessions a day for each of the PHP participants plus additional sessions on Saturday morning for those who missed sessions during the week. The group sessions were limited to 10 patients, as required by CMS, and were led by professionals, including therapists and social workers.

81.     In addition, Momentum participants received 1-to-1 follow-up sessions with Relator and other mental health professionals as needed and scheduled.

82.     At the close of the program each day, all group leaders met with the program administrator. During the meeting, individual patients were named and each group leader then indicated the groups in which the patient was present. This "charge capture" was recorded each day and was the means to monitor and ensure patients received the requisite hours of treatment.

83.     The team providing services to the PHP program documented the services provided, and met as an interdisciplinary group to discuss the effectiveness of the treatment plan, and monitored the progress of the patients toward their treatment goals.

84.     While Momentum had an excellent track record of attendance, if a patient

- 17 -

1   missed too many sessions or days, or proved unable to appropriately participate, Relator
2   discharged the individual from the program as not meeting the requirements to warrant
3   the per diem payment.

4        85.    A significant contributing factor in the program's success was that St. Luke's
5   paid for and provided transportation[12] for the individual PHP participants to and from the
6   program, and as needed for other medical appointments. St. Luke's maintained a fleet of
7   vans and a crew of drivers. From its beginnings in 2004 through the present, Employee B
8   has been the head of transportation for Momentum. His dedication to the program and his
9   continued involvement with the patients was instrumental in making sure they participated
10  fully in the program and received the required 20 hours of services. He and his crew were
11  aware of the situations that could prevent patients from participating and worked hard to
12  make sure everyone got to the program every day.

13       86.    In the course of Employee B's almost 20 years at Momentum and his
14  invaluable interactions with patients during the day, he has amassed relevant knowledge
15  and understanding of the program, its goals, the rules, and the characteristics of individuals
16  appropriate and inappropriate for the program.

17       87.    For many years, St. Luke's CEO Greg Jahn allowed Relator and Employee
18  A to manage the PHP without interference.

19       88.    The Momentum program was highly regarded in the community and
20  operated essentially without challenge from CMS, no doubt, because of its long history of
21  compliance with PHP requirements.

22     **B.**    **St. Luke's Began to Erode the Momentum Model of Compliance.**

23       89.    In about 2015, St. Luke's CEO began to interject himself more into PHP
24  operations and to make decisions against the advice of the Relator and Employee A.
25  Relator routinely reminded Jahn that the model shouldn't be tampered with because it
26  worked and was compliant.

27

28  ───────────────
    [12] Transportation was not a cost covered by CMS for PHPs.

90.    One of Jahn's "cost-saving" actions was to eliminate the in-house transportation function and have Employee B manage transportation using third-party vendors. This limited Employee B's effectiveness in ensuring patient attendance because the non-employee drivers did not have the same commitment to the program as previously and did not have the same knowledge of the patients.

91.    Sensing that Jahn was in the process of cutting corners on the program and the care given to PHP patients, Employee A resigned.

92.    St. Luke's did not replace Employee A with a program administrator, but instead relied on program coordinators who were capable, but had shorter tenures, and lacked authority to ensure program compliance.

93.    Rather than cutting from the program, Relator discussed with Jahn the advantage of increasing the program to 5 groups a day to make it easier for patients to get their 20 hours of services. Jahn's response was words to the effect that he would rather save the extra cost and take his chances. He further admitted that he knew St. Luke's would be in "big trouble" if CMS reviewed the program but felt the odds of review were very small.

94.    From that time forward, Relator observed a steady decline in the number of patients meeting the 20-hour rule and voiced his concern about this to Jahn on many occasions.

95.    Shortly after the time that St. Luke's switched from paper to electronic record-keeping, Relator was told that he did not need to certify patients for the PHP program anymore. Relator responded that the rules required certifications, but he was told not to do them.

96.    Because Momentum still had to rely on Relator to admit patients, Relator followed the instruction he received, but continued to only admit patients that met the criteria for participation. He also continued to follow the patients during their participation in the program.

97.    In his later years at Momentum, Relator also observed group sessions with

more than 10 participants, in violation of the rule that group sessions should be limited to 10 persons. Relator voiced his concerns about that to Jahn, to no avail.

98.   In mid-2019, St. Luke's closed Momentum: East Valley

99.   When the Covid crisis hit, the Steward Medical Director conducted a meeting on March 19, 2020 with physicians throughout their facilities, to discuss how its hospitals would continue to provide essential services.

100.  The next day, Relator sent a memorandum to Steward and St. Luke's executives expressing his concerns about whether on-site outpatient mental health programs should be continued during the Covid 19 public health emergency for the 38 patients in the Momentum program. He  recommended alternatives, such as allowing patients to receive services from their homes as each patient had a primary physician and caseworker that could provide additional support and supervision. Relator further offered to arrange for and staff up such a program, as he already had success in using a telehealth platform.

101.  Despite Relator's expressed concerns for patient safety, St. Luke's did not modify Momentum during the pandemic. Relator continued to admit patients for on-site treatment at St. Luke's.  St. Luke's placed patients in group sessions with more than 10 patients who sat shoulder-to-shoulder in sessions and at lunch without wearing masks.

102.  In about 2020, a nurse, Employee C, took over the Momentum program coordinator position. She had worked with Relator previously, and was very knowledgeable about the Momentum program.

103.  In about June 2020, Jahn retired and Julie Miller became the President of St. Luke's. Miller has a degree in clinical psychology.

104.  On June 25, 2020, Miller called a meeting with Relator and Dr. Joaquin Bermudez, medical director of the hospital's inpatient units.  In the meeting, Miller asked Dr. Bermudez to remain as medical director of inpatient units and asked Relator to be the medical director of the entire outpatient department, not just Momentum. Relator  said he would think about it.

105.  Miller then told Relator she intended to fold other outpatient programs under the Momentum name. Relator strongly opposed this as Momentum had a reputation in the community for providing a particular model of service for a particular target population with criteria different than other types of programs.

106.  Miller further told Relator that she expected all patients to be admitted to the program. Relator explained to her why this was not appropriate and said that he would only admit patients who met the criteria for PHP services.

107.  On July 30, 2020, Miller and a new director of outpatient services met with Relator, along with Employees B and C to discuss the Momentum program.  Miller reiterated her direction that Relator admit all patients to Momentum.  Relator explained the requirements imposed by Medicare and tried to explain how the PHP had to be administered to avoid potential violations, including committing fraud.  After Relator restated that he would not commit fraud and would only admit those appropriate for the program, Miller got angry and left the meeting.

108.  In a letter, dated August 14, 2020, from Relator to Miller, Relator stated that he had expressed concerns on multiple occasions to hospital administration regarding ongoing CMS violations regarding Momentum and the lack of COVID-19 safety protocols.  Relator stressed that he could no longer admit new patients until these issues were addressed and remedied, and safety measures were in place.

109.  On August 24, 2020, Miller sent a letter by certified mail to Relator, which he received some days later, notifying him that St. Luke's was terminating him immediately as medical director of Momentum.

110.  The letter wrongly accused him of conduct that did not occur, and inflated into a terminable offense, an absence due to illness that Relator reported to the program coordinator, Employee C.

111.  The untrue and flimsy reasons given for Relator's termination are belied by Relator's more than 16 years of successful functioning at St. Luke's with no prior accusations of poor performance or misconduct. Those faulty reasons and the timing of

the letter also signal the real reason for Relator's termination: retaliation for refusing to accept all comers into the PHP program, which he reported to St. Luke's would constitute fraud against the government.

112.   On August 28, 2020, St. Luke's chief of staff sent Relator a letter by certified mail, which Relator received on September 9, 2020.

113.   The letter wrongly claimed that Relator had "exhibited unprofessional and disruptive conduct" and informed him that a recommendation was made to the Medical Executive Committee on August 27, 2020 to issue him a "Warning Letter" and that "one more reported issue of disruptive & unprofessional conduct may lead to additional corrective actions as warranted." Again, this was the first time that any of these accusations were leveled against Relator.

114.   In further retaliation, St. Luke's cut off Relator's entire ability to admit patients or provide services to PHP/IOP patients at St. Luke's, stating: "due to the termination of your Directorship contract and a decline in census, we no longer require your services for outpatient IOP and PHP Psych evals or follow up appointments at St. Luke's Behavioral Health Center."

115.   The letter indicated that a recommendation had been made to the Medical Executive Committee to issue Relator a warning letter, but no such letter was ever sent.

116.   Relator maintained his medical privileges at St. Luke's until he voluntarily decided to not to renew them at the beginning of 2021.

**C.    St. Luke's Engages in Continued and Expanded Fraud.**

117.   Once Relator was terminated, St. Luke's fraudulent abuse of the government's coverage for PHP services continued and expanded under its then-president Julie Miller and her successor, Phil Sheridan who became president in January 2022.

118.   St. Luke's fraudulent conduct was observed and reported to Relator by Employees B and C. Employee B continued to work for Momentum after Relator's termination, and still works there now. Employee C also continued to work as program coordinator for Momentum after Relator's termination until about mid-2021 when she

1    resigned.

2       119.    Because Employee B is well-informed about and experienced in the

3    implementation of the PHP program, and because of his day-to-day interaction with the

4    Momentum patients and other staff, Employee B is in a position to observe this continued

5    degradation of Momentum's PHP program and, accordingly, St. Luke's fraud against the

6    Government.

7       120.    Following Relator's termination in August of 2020, Employee B reported to

8    him that St. Luke's was frequently placing more than 10 patients in the treatment groups,

9    in violation of CMS regulations.

10      121.    About a year after Relator's termination Employee B reported to him that,

11   from his observation, about 75% of the patients failed to participate in 20 hours of PHP

12   treatment each week and about half participated in 10 or fewer hours of treatment.

13      122.    Employee B further observed that St. Luke's continues to fail to certify

14   patients as part of the admission process, fails to re-certify patients in the required intervals,

15   and fails to provide physician follow-up for program attendees.

16      123.    In about mid-2021, the then-Momentum program coordinator, Employee C,

17   contacted Relator for an employee reference and told him she "could not take it anymore

18   and resigned" from St. Luke's.  She said that Momentum was a high-quality program when

19   Relator was the Medical Director, but after he left, rules and guidelines were broken,

20   making the program of such low quality that she wanted no part of it.

21      124.    Some months later, Employee B informed Relator that compliance with PHP

22   requirements had worsened.  He estimated that only about 5% of PHP patients were

23   receiving the required number of services each week.  He further observed that many

24   patients skipped multiple days each week and some even a week or two at a time but were

25   continued in the program.

26      125.    Employee B further observed that Momentum continued to admit

27   inappropriate patients.  He also noted that patients were not receiving follow-up care from

28   a physician.

126.   In a June 2023 interaction, Employee B told Relator that the program was worse than ever.

127.   In sum, absent Relator's (or anyone else's) insistence on compliance, St. Luke's routinely admitted individuals to Momentum who did not meet the CMS criteria, failed to certify the eligibility of PHP participants for the program, allowed individuals to remain in the program regardless of whether they participated in 20 hours of treatment, operated group sessions with more than 10 participants, and failed to have a physician provide follow-up care to the patients.

128.   On information and belief, St. Luke's was making and causing false statements to be made about its PHP participants and submitting fraudulent claims for per diem payments for patients, likely in all instances without required certifications, in many instances for individuals who did not meet the eligibility requirements for the program, and for almost all patients, eligible or not, who were not receiving the required 20 hours of services per week.

129.   The bases for the above information and belief include:  the pattern of failure to certify eligibility had begun before Relator was terminated; St. Luke's could not afford to provide PHP services for free to inappropriate patients; and the PHP continues to function, indicating that it is being funded by CMS. If St. Luke's were providing truthful information about the individuals in the PHP program and the nature of the "treatment" provided, CMS would have rejected and not paid the claims because they did not meet PHP requirements.

## VII.   DEFENDANTS' FCA VIOLATIONS[13]

### A.   Liability under 31 U.S.C. § 3729(a)(1)(A) and (B)

130.   As alleged by Relator, St. Luke's systematically billed Medicare for PHP services that were not medically necessary and/or not provided pursuant to the governing

---

[13] This section does not purport to exhaustively recite all of the evidence in the Complaint that supports the alleged claims, but to highlight significant components of that evidence.

1    laws and regulations.  By implementing this scheme, St. Luke's knowingly presented, or

2    caused to be presented, false or fraudulent claims for payment or approval in violation of

3    31 U.S.C. § 3729(a)(1)(A). In addition, through their fraudulent actions, Defendant

4    knowingly made, used, or caused to be made or used, false records or statements material

5    to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

6               **1.  Falsity**

7        131.    Every time St. Luke's billed CMS through Noridian for a PHP per diem rate

8    for a patient who did not meet the criteria for participation in the program, and or whom it

9    did not certify as eligible for the program, St. Luke's made false statements and claims

10   when it certified eligibility for coverage. Every time St. Luke's billed CMS through

11   Noridian for a PHP per diem rate for patients (1) who did not receive 20 hours of treatment

12   per week, (2) whose group sessions exceeded 10 participants, (3) who were allowed to

13   remain in the program regardless of whether they participated in 20 hours of treatment

14   and/or regardless of whether they continued to be appropriately placed in the program,

15   and/or (4) who were not followed by a physician, St. Luke's made false statements and/or

16   submitted false claims for payment because St. Luke's violations of PHP requirements

17   made those statements and claims false.

18              **2.  Knowledge**

19       132.    While knowledge may be generally alleged under Fed. R. Civ. P. 9(b),

20   Relator made the requirements for billing PHP claims clear to St. Luke's CEO's Greg Jahn

21   and Julie Miller. In addition, as an established institution offering behavioral health

22   programs, St. Luke's is reasonably charged with knowledge of the requirements for the

23   specific programs it offered. In addition the cavalier attitude of Jahn, who said he would

24   rather save cost and take his chances even though he knew the PHP was non-compliant,

25   and the belligerent attitude of Miller when Relator told her it would be fraud to accept

26   persons not qualified for the PHP indicate their knowledge of the compliance that was

27   required.

28

### 3. Materiality

133.   As stated above, compliance with applicable statutes and regulations is an express condition of payment for PHP claims.

134.   The express conditions of payment are very specific and go to the heart of the purpose for PHP programs, to ensure that persons who are severely mentally ill can receive intensive treatment in a controlled outpatient setting, in lieu of hospitalization, with clearly articulated requirements as well as an individualized plan of treatment.

135.   The per diem payment for a PHP is about $260/day which adds up to $1,300/week.

136.   Accordingly, the principles at issue and the amounts of money involved are neither minor nor insubstantial.

137.   As explained above, the express conditions for payment are more than a general agreement to comply with "applicable" law. PHP services can only be covered if an individual "would require inpatient psychiatric care in the absence of such services." 42 U.S.C. § 1395n(a)(2)(F)(i) and if a physician certifies (and recertifies, if necessary) that need, along with other specific requirements, including the physician's diagnosis and that treatment goals were set. 42 C.F.R. §§ 424.24(b), (e). Accordingly, a claim to cover PHP services under the per diem rate code not only requests payment, but makes specific representations about the services provided such that "failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Universal Health Services, Inc. v. U.S.*, 579 U.S. 176, 190.

138.   The vulnerability of PHP programs to abuse has caused the government to impose more stringent billing requirements to enhance the government's ability to determine whether the requirements of the program have been met. For example, CMS requires providers to present information about PHP claims in service date sequence so that it can be determined that a prior week's requirement has been met and paid before considering payment for the following week. *See e.g.,* CMS Medicare Learning Network

Matters 8048.[14]

139.    Relator is aware that if PHP providers are suspected of fraudulent conduct, CMS will require those providers to submit to pre-payment audits and will deny payment of the claim if the PHP requirements are not met.

140.    The Government will also shut down PHP providers and criminally charge individuals that fail to provide eligible individuals with appropriate services.[15]

141.    All of the above confirms that the fraudulent conduct at issue would have a natural tendency to influence or be capable of influencing the government's decision to pay a per diem PHP claim.

### 4. Damages

142.    The population of persons served by St. Luke's PHP program consist primarily of persons on Medicare by virtue of receipt of SSDI or age. This and other facts alleged in this case establish reliable indicia that false claims were in fact paid by the Government, causing harm to the Government in that its funds were not being spent for their intended purpose, and significantly, causing harm to patients who did not receive the care required by the PHP or were inappropriately placed in a treatment setting not appropriate to their needs.

### B.    St. Luke's FCA Violations Have Been Pled with Specificity.

143.    With respect to Counts I-II, presentment and false record claims, the specificity is quite simple: **Who**: St. Luke's; **What**: certified that it would comply with applicable statutes and regulations; and, when making claims for PHP per diem payments, certified it was in compliance with those statutes and regulations and that the claims were

---

[14] https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/MM8048.pdf

[15] *See e.g.,* https://www.policymed.com/2021/06/sentencing-finally-completed-for-189-million-medicare-fraud-scheme.html#:~:text=Continuum%20billed%20Medicare%20roughly%20%20%24189,in%20relation%20to%20the%20scheme; https://www.justice.gov/opa/pr/texas-hospital-administrator-sentenced-10-years-prison-role-16-million-health-care-fraud

accurate, complete, and truthful; **When**: every time a claim for payment under the PHP was made; **Where**: in the certifications identified above and in claims for PHP per diem payments submitted to Noridian; **Why**: such certifications were a condition of payment by CMS and AHCCCS; **How were the presentments and records false**: when asserting claims for PHP per diem amounts for patients, St. Luke's at least impliedly certified compliance with specific statutory and regulatory requirements and that its claims were accurate, complete, and truthful; St. Luke's failure to disclose its noncompliance with those statutory and regulatory requirements makes those representations misleading half-truths.

## VIII.  CAUSES OF ACTION

### COUNT I – Violation of 31 U.S.C. § 3729(a)(1)(A)
#### (FCA: Presentation of False Claims)
#### Against Defendants St. Luke's Behavioral Hospital, L.P.
#### and Steward Health Care System

144.    Relator re-alleges the allegations set forth in paragraphs 1 through 143, as if fully set forth herein.

145.    This a claim for treble damages, statutory penalties, and other relief under the FCA.

146.    Through the acts described above and otherwise, Defendant, by and through their agents and employees, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented to the United States materially false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

147.    Each of the false or fraudulent claims Defendant submitted, or caused to be submitted, is a separate violation of 31 U.S.C. § 3729(a)(1)(A), which supports the imposition of statutory penalties for each violation.

148.    In addition, the United States was unaware of the false or fraudulent nature of the claims Defendant submitted or caused to be submitted.

149.    The false or fraudulent claims Defendant knowingly submitted or caused to

be submitted to the United States were material to the United States' decisions and legal authorization to make payments to Defendant.

150.   Had the United States actually known of the false or fraudulent nature of the claims, it would have been prohibited by law from making corresponding payments.

151.   Because of these false or fraudulent claims Defendant submitted or caused to be submitted, the United States has been damaged in an amount to be determined at trial, which amount is statutorily required to be trebled.

**COUNT II – Violation of 31 U.S.C. § 3729(a)(1)(B)**
**(FCA: Using False Statements Material to False Claims Paid)**
**Against Defendants St. Luke's Behavioral Hospital, L.P.**
**and Steward Health Care System**

152.   Relator re-alleges the allegations set forth in paragraphs 1 through 143, as if fully set forth herein.

153.   This a claim for treble damages, statutory penalties, and other relief under the FCA.

154.   Through the acts described above and otherwise, Defendant, by and through their agents and employees, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

155.   Defendant' false certifications and representations were made for the purpose of ensuring that the United States paid the false or fraudulent claims, which was a reasonable and foreseeable consequence of Defendant' statements and actions.

156.   The United States was unaware of the falsity of the records, statements, and claims Defendant made or submitted and, because of the falsity of these records or statements, authorized payments to be made, made such payments, and has been damaged.

157.   The false records or statements Defendant knowingly made to the United States were material to the United States' decisions to make payments to Defendant.

- 29 -

158.    Had the United States actually known of the false or fraudulent nature of Defendant' representations and claims, it would have been prohibited by law from making corresponding payments.

159.    Because of these false records or statements, the United States paid claims, resulting in damages to the United States in an amount to be determined at trial.

**COUNT III**
**Retaliation in Violation of the FCA**
**31 U.S.C. § 3730(h)**
**Against Defendant St. Luke's Behavioral Hospital, LP**

160.    Relator re-alleges the allegations set forth in paragraphs 1 through 143, as if fully set forth herein.

161.    As an independent contractor or agent of St. Luke's, Relator was unlawfully threatened, harassed, and discharged by Defendant, that is, St. Luke's removed Relator from his position as Medical Director for Momentum and further deprived him of the ability to "provide services for outpatient IOP and PHP Psych evals or follow up appointments at St. Luke's Behavioral Health Center." St. Luke's conduct was in retaliation for lawful acts done by him on behalf of the United States and the general public in furtherance of an action under the FCA, as well as his efforts to stop one or more violations of the FCA. Defendant violated 31 U.S.C. § 3730(h)(1) when they retaliated against Relator for exercising his rights and engaging in protected action under the FCA.

162.    As a direct result of Defendant's unlawful retaliatory conduct, Plaintiff has experienced damages for which he is entitled to relief under 31 U.S.C. § 3730(h)(2).

**IX.    PRAYER FOR RELIEF**

WHEREFORE, Relator, on his own behalf and on behalf and in the name of the United States, requests that the Court:

A.    Enter judgment for the United States and Relator and against Defendant;

B.    Order Defendant to cease and desist from violating the FCA;

C.    Award the United States Government, three times the amount of the actual

1  damages sustained by the Government as a result of Defendant' violations of

2  the False Claims Act as alleged in this Complaint;

3  D.  Assess civil penalties in the maximum amount available against Defendant

4  for each and every false claim submitted, or caused to be submitted, by

5  Defendant to the United States Government in connection with the false or

6  fraudulent billing alleged in this Complaint;

7  E.  Award Relator the maximum relator's share allowed pursuant to 31 U.S.C. §

8  3730(d);

9  F.  Award Relator all reasonable expenses that were necessarily incurred in

10  prosecution of this action, plus all reasonable attorneys' fees and costs, as

11  provided by the FCA;

12  G.  Award interest on money judgments, as provided by law;

13  H.  Award the Relator, and against St. Luke's Behavioral Hospital, LP, with

14  respect to his federal retaliation claim:

15  1.  Two times the amount of any back pay that he would have earned but for

16  the retaliatory conduct, and interest on the back pay;

17  2.  Reinstatement or front pay in an amount to be determined at trial;

18  3.  Compensation for all damages available under law that were sustained as

19  a result of St. Luke's retaliation against Relator;

20  4.  Attorneys' fees and costs.

21  I.  Grant such other relief for the United States and Relator as the Court deems

22  just, necessary, and proper.

23  **X.  REQUEST FOR TRIAL BY JURY**

24  Pursuant to Federal Rule of Civil Procedure 38, Relator hereby requests a trial by

25  jury.

26  Dated: August 16, 2023

27  Leonard Aragon, AZ #020977

28  HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000

Phoenix, Arizona 85003
Telephone: (602) 840-5900
Fax: (602)840-3012
leonard@hbsslaw.com

HALUNEN LAW
Susan M. Coler*
Minnesota State Bar No. 217621
80 South 8th Street
IDS Center, Suite 1650
Minneapolis, MN 55402
Telephone: (612) 605-4098
Fax: (612) 605-4099
coler@halunenlaw.com
(*pro hac vice* forthcoming)

*Attorneys for Plaintiff/Relator*